| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
|---|---|---|---|
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Laura Elias | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: | |
| Kristin Escalante | Jonathan Shapiro | |
| Mark Jasper | Ariel House | |

**Proceedings:** DEFENDANT'S MOTION TO DISMISS THE COMPLAINT (filed 10/16/2017) [10]

## I.  INTRODUCTION

On August 22, 2017, the Securities and Exchange Commission ("SEC") filed a civil complaint against defendant Jeremy Joseph Drake ("Drake"), an investment adviser. Dkt. 1 ("Compl.") ¶ 7. The SEC brought two claims against Drake: (1) fraud by an investment adviser in violation of §§ 206(1)–(2) of the Advisers Act, and (2) aiding and abetting fraud by an investment adviser in violation of §§ 206(1)–(2) of the Advisers Act. Those statutes make it illegal for any investment adviser to use mail or any means of interstate commerce to: "(1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. §§ 80b-6(1)–(2).

According to the SEC, Drake defrauded Mr. A and Ms. A (collectively "Clients"). Id. ¶¶ 8–9. Mr. A is a high-profile athlete and Ms. A is his spouse. Id. ¶ 5. Specially, the SEC alleges that Drake knowingly, recklessly, and negligently lied to the Clients about the amount they paid in management fees, provided false and misleading information about those fees, fabricated and sent false documents, created a false persona to support his deception, and enlisted a confederate to help deceive the Clients.

On October 16, 2017, Drake filed the instant motion to dismiss the SEC's complaint. Dkt. 10 ("MTD"). The SEC filed its opposition to Drake's MTD on November 27, 2017. Dkt. 12 ("Opp'n"). On December 4, 2017, filed its reply. Dkt. 13 ("Reply").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

## II. BACKGROUND

The SEC alleges these facts. Drake was an SEC-registered investment adviser with HCR Wealth Advisers, Inc. ("HCR") from March 2009 to July 2016. Compl. ¶¶ 7, 44. HCR is an SEC-registered investment adviser firm that maintains its clients' accounts at Charles Schwab & Co., Inc. ("Schwab"). Id. ¶¶ 8–9. In committing the acts alleged in the complaint, Drake acted within the scope of his employment with HCR. Id. ¶ 46. While working for HCR, Drake managed over $50 million in assets for more than 20 clients—including Mr. A and Ms. A. Id. at ¶¶ 8–9.

HCR charges its clients an annual management fee for investment adviser services. Id. ¶ 10. These fees, billed quarterly in advance, are automatically deducted from clients' Schwab accounts and paid to HCR. Id. A significant portion of Drake's personal compensation at HCR came from the fees HCR charged clients for assets under his management. Id. ¶ 11. During Drake's first three years at HCR, the firm paid him a $60,000 annual salary plus "incentive-based compensation" between 40% and 50% of his clients' fees. Id. In April 2013, HCR agreed to pay Drake 60% of his clients' management fees in lieu of a salary. Id. HCR paid Drake under this new agreement for the remainder of his time with HCR. Id.

The Clients met Drake in 2008, when he worked for another investment adviser firm. Id. ¶ 12. On behalf of the Clients, Ms. A signed an "Investment Advisory Agreement" with HCR in September 2009 (the "2009 Agreement"). Id. ¶ 13. Drake signed the agreement on behalf of HCR. Id. The 2009 Agreement stated that the clients would pay an annual management fee equal to 1.0% of their assets under HCR's management, and that the agreement would automatically renew each quarter. Id. It also allowed either party to unilaterally terminate the agreement. Id.

The Clients ultimately placed more than $35 million under Drake's management. Id. ¶ 12. Drake was the Clients' sole contact at HCR while he was their investment adviser. The Clients looked to Drake to manage their accounts, and Drake personally managed the Clients' investments throughout their relationship. Id. ¶¶ 12, 45. Drake was responsible for the day-to-day management of the Clients' investments. Id.

Ms. A, her assistants, and her accountant primarily communicated with Drake about management of the Clients' assets and management fees. Id. ¶ 13. She met with Drake once or twice each year to discuss the Clients' accounts. Id. ¶ 16. English is not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**    'O'

| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

Ms. A's first language, and she always brought an assistant to act as an interpreter. Id. In November 2012, per Ms. A's instructions, her first assistant (Assistant 1) emailed Drake and asked if, at the next meeting, he "would be able to provide a simple explanation of all the fees, expenses and charges the [Clients] pay in regards to all the services they receive from [HCR]." Id. In reply, Drake agreed to provide "a detailed explanation of all fees associated with the work [HCR] provides." Id.

On or about November 20, 2012, Ms. A and Assistant 1 met with Drake. Id. ¶ 17. During this meeting, Drake told Ms. A and Assistant 1 that since 2010, the Clients had paid a special "VIP" management rate between 0.15% and 0.20%. Id. Specifically, Drake told Ms. A and Assistant 1 that the Clients were paying an initial 1.0% fee, billed quarterly, but were receiving periodic credits in their brokerage accounts that resulted in a net fee in the discounted range. Id. These statements were false. Id. The Clients were actually paying fees equal to 1% of their assets under management with no credits that resulted in a net fee in the discounted range. Id.

Ms. A and Assistant 1 met with Drake again in April 2013. Id. ¶ 18. After that meeting, Assistant 1 asked Drake, on behalf of Ms. A, to further clarify the management fees. Id. Drake again represented that the Clients were paying between 0.15% and 0.20% of their assets under management, and he offered to provide documents to help the Clients understand the management fees and credits. Id. Assistant 1 asked Drake to do so. Id.

Soon after, on April 29, 2013, Drake emailed Assistant 1 "management fee reports" that purportedly set forth the management fees for two of the Clients' accounts. Id. ¶ 19. The first report purported to list the quarterly fees paid from one of the Clients' accounts during 2010, 2011, and 2012, along with credits against those initial fees. Id. The report concluded that the credits offset the Clients' fees by approximately 83%, resulting in a 0.177% net rate and $44,994 in net fees. Id. The second report listed quarterly fees paid from another of the Clients' accounts in 2011 and 2012 with the purported credits that offset those fees. Id. That report purported to show the credits offset the Clients' fees by 85%, resulting in a 0.15% net rate and $34,737 net fees. Id. Assistant 1 shared these reports with Ms. A. Id.

Those reports and numbers were a fabrication. Id. ¶ 20. In reality, the Clients had paid all of the quarterly fees listed in the reports but did not receive any credits. Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**  'O'

| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

Whereas the reports said the Clients paid rates of 0.177% and 0.15% and fees of $44,994 and $34,737, they actually paid a 1.0% rate in both accounts, resulting in actual fees of $280,349 and $231,889.  Id.  The difference between what Drake said the Clients paid from those accounts during those periods and what they actually paid was more than $430,000.  Id.  Drake was compensated with approximately $190,000 of those fees.  Id.

In early 2014, Ms. A hired a new assistant (Assistant 2).  Id. ¶ 22.  Ms. A asked Assistant 2 to help her understand HCR's fees because she was still confused about the "credit" system.  Id.  Starting in May 2014, Assistant 2 asked Drake for reports to confirm the fees paid and credits received.  Id.  Over the next several months, Drake repeatedly told Ms. A and Assistant 2 that the Clients were being charged a 1.0% fee, which was reduced by "credits" that resulted in a "[n]et fee of approximately 0.15% after the credits have been processed."  Id.  Drake repeatedly sent Ms. A and Assistant 2 false and misleading documents supporting that explanation.  Id.

On June 2, 2014, Assistant 2 asked Drake for documents reflecting the timing and amounts of fees and credits so that he and Ms. A could review them.  Id. ¶ 23.  The next day, Drake emailed what he described as "the most recent management fee reports" from Schwab for the Clients' accounts.  Id.  The email purported to list fee credits, net fees, and fee percentages for three of the Clients' accounts.  Id.  All of this information was false because the Clients had not received any credits.  Id.  But the attachments Drake included seemed to support his explanation and appeared to be authentic Schwab documents.  Id.  In fact, they were doctored Schwab statements that Drake altered to include "ADVISOR FEE CREDIT" entries that did not exist in the original.  Id.  When Assistant 2 expressed that he could not understand those entries, Drake sent him a long explanation about how Schwab paid the credits and explained that the complicated process was only in place for "top tier clients."  Id.  Drake then represented that he ensured that the system was in place for the Clients because of their "fee sensitivity."  Id.

Drake continued sending false and misleading documents to Ms. A and Assistant 2.  Id. ¶ 24.  On June 16, 2014, Drake sent Assistant 2 a wholly fabricated brokerage statement—featuring Schwab's logo—that purportedly reflected credits and net fees for the Clients' accounts dating back to 2010.  Id.  On September 11, 2014, Drake emailed Assistant 2 a supposed "Account Management Fee Summary" with purported "fee credits" and represented that it was "the complete and accurate accounting for the management fees to date."  Id.  Drake insisted these numbers were correct and that Ms. A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

would have to accept them, even though the accounting and legal requirements made them hard to understand. Id.

In early 2016, Ms. A tried again to understand the management fees with the aid of a third assistant (Assistant 3) and a newly hired accountant. Id. ¶ 25. On April 12, 2016, Drake sent Assistant 3 a false and misleading report for the Clients' accounts for the first quarter of 2016. Id. ¶ 26. Assistant 3 forwarded this report to Ms. A. Id. On April 22, 2016, Drake sent Assistant 3 a text message saying the Clients had "always" paid between 0.15% and 0.20% based on the 2009 agreement they signed with HCR. Id. ¶ 27. Drake represented that the credits "primarily came from the bond interest paid by Schwab." Id. This was false. Id. In the coming months, Drake sent Assistant 3 many more false documents and made more false representations. Id. ¶¶ 29–34.

In early June 2016, Ms. A asked Drake to provide a contact person at Schwab who could explain the fee credits. Id. ¶ 35. Ms. A was frustrated that she, her assistants, and her accountant were unable to understand the credits after so much time. Id.

Responding to Ms. A, Drake created a false persona named "Ron Stenson" whom he held out as an employee of "Charles Schwab Advisor Services." Id. Drake also created "Stenson" an email address from which he sent Ms. A, Assistant 3, and Ms. A's accountant numerous false and misleading emails and attachments. Id. Drake sent more than a dozen "Stenson" emails to Ms. A and her representatives in June 2016. Id. Drake also licensed a telephone number from an Internet provider, which he gave to Ms. A and her representatives as a number to reach Stenson. Id. ¶ 36. Drake set up a voicemail box to receive these calls. Id. Drake then connected Ms. A's accountant with a confederate who posed as Stenson in two or three calls with the accountant and corroborated Drake's explanation of the fees and credits. Id.

By late June 2016, Ms. A started to believe that Drake had been lying to her about the management fees for years. Id. ¶ 37. Thus, Ms. A contacted Schwab, prompting Schwab to contact HCR about Drake. Id.

On July 4, 2016, Drake sent Ms. A an email confessing that he lied. Id. ¶ 38. Drake admitted that there was no "credit" system that reduced the Clients' fees, and that they paid higher fees than they were told. Id. He also confessed to "sending false information" and involving a confederate to confirm the false story. Id. In the same email, Drake pleaded with Ms. A to lie to Schwab to help him keep his securities license.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL     'O'

| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
|---|---|---|---|
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

Id. ¶ 39. Drake warned Ms. A that escalating his misconduct with Schwab could result in bad publicity for her. Id. Ms. A refused to lie for Drake. Id.

HCR fired Drake on July 8, 2016. Id.

## III. LEGAL STANDARDS

### A. Rule 12(b)(6)

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint. Under this Rule, a district court properly dismisses a claim if "there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" Conservation Force v. Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting Balisteri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id.

In considering a motion pursuant to Rule 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. Pareto v. FDIC, 139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). However, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); see Moss v. United States Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

**B.     Rule 9(b)**

Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting a claim for fraud be pleaded with particularity. Rule 9(b) applies not just where a complaint specifically alleges fraud as an essential element of a claim, but also where the claim is "grounded in fraud" or "[sounds] in fraud." Vess v. Ciba–Geigy Corp. U.S.A., 317 F.3d 1097, 1103–04 (9th Cir. 2003). A claim is said to be "grounded in fraud" or "sounds in fraud" where a plaintiff alleges that defendant engaged in fraudulent conduct and relies solely on that conduct to prove a claim. Id. at 1103. "In that event, . . . the pleading of that claim as a whole must satisfy the particularity requirement of [Rule] 9(b)." Id. at 1103–4. However, where a plaintiff alleges claims grounded in fraudulent and non-fraudulent conduct, only the allegations of fraud are subject to heightened pleading requirements. Id. at 1104.

A pleading is sufficient under Rule 9(b) if it "[identifies] the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." Walling v. Beverly Enters., 476 F.2d 393, 397 (9th Cir. 1973). This requires that a false statement must be alleged, and that "circumstances indicating falseness" must be set forth. In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994). Thus, Rule 9(b) requires a plaintiff to "identify the 'who, what, when, where and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent conduct], and why it is false.'" Cafasso, ex rel. United States v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)).

**III.     DISCUSSION**

  **A. SEC's Claims Under §§ 206(1)–(2), and Pleading Pursuant to Rule 9(b)**

Drake argues that the SEC has not complied with Rule 9(b)'s pleading standards that are applicable to fraud claims. MTD at 7. The gravamen of Drake's argument is that the SEC has not identified by name various people in the complaint. Id. at 8. Drake also

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**  'O'

| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
|---|---|---|---|
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

argues that the SEC did not satisfy Rule 9(b)'s requirements because it does not identify the account numbers that are discussed in the complaint. Id. Finally, Drake argues that the complaint does not distinguish between Schwab's actions Drake's behavior. Id. at 9.

The Court finds that the SEC's allegations sound in fraud. Thus, the SEC must satisfy Rule 9(b). As explained below, the SEC has met these heightened standards.

The Ninth Circuit has held that "[n]aming sources is unnecessary so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." In re Dauo Systems, Inc., 411 F.3d 1006, 1015 (9th Cir. 2005). In Dauo Systems, the Ninth Circuit held that the plaintiffs sufficiently described several confidential witnesses to satisfy Rule 9(b) by providing the defendant the witnesses' job responsibilities. Id. at 1016. According to the Ninth Circuit, this description satisfied Rule 9(b)'s requirements: "Confidential Witness 9 ('CW9') is a former Daou Regional Vice President of Sales. As Vice President of Sales, CW9 was responsible for reporting weekly or bi-weekly sales information, such as sales status/backlog and forecast/pipeline information, to Daou's Vice Presidents and corporate officers." Id.

Based on Daou Systems, the SEC's complaint plainly meets Rule 9(b)'s particularity requirements. The complaint provides ample details that allow Drake to discern who the unnamed individuals are. Among other things, the complaint alleges that: (1) the Clients trusted him to manage more than $35 million; (2) the Clients are married, and one is a high-profile professional athlete; (3) Ms. A used interpreters to communicate with Drake; and (4) Drake sent Ms. A an email on July 4, 2016 confessing that he misled the Clients. Compl. ¶¶ 5, 12, 16, 38. Moreover, contrary to Drake's argument, MTD at 9, the accounts at issue are sufficiently identified. The SEC pled specific dates and calculations that would allow Drake to recognize which accounts the SEC refers too. Compl. ¶¶ 19, 20, 25–32. And the Complaint has additional detail about how the Clients jointly held the accounts and how Schwab deducted the management fees. Id. ¶¶ 5, 13.

Finally, Drake takes issue that the Complaint does not adequately distinguish his actions from Schwab's activities. The SEC plainly explains how Drake is responsible for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**        'O'

| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
|---|---|---|---|
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

all these actions as an HCR employee. Id. ¶¶ 14–38, 44–48, 54–60. The complaint focuses exclusively on Drake's conduct. See MTD at 14.

Because the SEC has pled with particularity to allow Drake to determine the details of the misconduct charged, the Court **DENIES** his motion to dismiss for failure to satisfy Rule 9(b).

### B. Whether Drake's Misrepresentations Were Material

Drake next argues that any misstatements he made to Ms. A and her representatives were immaterial. First, Drake argues that he could not have committed fraud because the Clients signed a contract that disclosed the 1% management fee. Id. at 10. Second, Drake argues that the Clients did not find any possible inaccuracy in the commission rate important. Id. at 10–11. Neither argument is convincing.

The SEC pleads ample facts to show that the Clients remained with Drake because they believed they were receiving credits to lower the 1% rate. Ms. A went to great lengths to comprehend the credit system. To better understand the credit system, Ms. A hired an accountant and sought a contact person at Schwab. Compl. ¶¶ 25, 35. Contrary to Drake's claims, it was never clear that the Clients were paying a 1% adviser rate. Drake told the Clients they were paying a special VIP rate, and told Ms. A that she would have to accept his recitation of the rates. Id. ¶¶ 17, 24. Indeed, the complaint alleges that Drake went to extraordinary lengths to forge documents to convince the Clients they were effectively paying an adviser rate between 0.15% and 0.20%. Id. ¶¶ 29–34.

Drake's argument that the Clients did not find a difference in adviser rate of 0.8% material is also unconvincing. In the investment context, differences by tenths of points are significant. The Clients had $35 million under asset with Drake. Id. ¶ 12. The difference between a management rate of 0.20% and 1% amounts to $280,000 a year. That cannot be said to be immaterial—even for a professional athlete. Indeed, Ms. A's efforts to understand the credit system show that she did not see Drake's numbers as immaterial.

Drake's misstatements were material. Thus, Drake's motion to dismiss for lack of materiality is **DENIED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL     'O'

| | | | |
|---|---|---|---|
| Case No. | 2:17-cv-06204-CAS(GJSx) | Date | December 18, 2017 |
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | |

### C. Aiding and Abetting Liability

Next, Drake argues that he cannot be liable for aiding and abetting a violation of the Adviser Act. The crux of Drake's argument is that the complaint does not allege misconduct from any HCR employee beside himself. MTD at 14. Thus, he cannot be liable for aiding and abetting because only his conduct is in question. Id.

The SEC counters that Drake violated the Adviser Act while he was an employee at HCR. Accordingly, HCR is liable for Drake's activities under the doctrine of respondent superior. Opp'n at 21. And Drake would be liable for aiding and abetting the fraud for which HCR is responsible.

There is a split as to whether one can be liable for aiding and abetting when the primary violation is based on their conduct. In SEC v. Daifotis, the court held that aiding and abetting requires proving a primary violation by another person, and that respondent superior liability will not do. 874 F. Supp. 2d 870, 887 (N.D. Cal. 2012). Other courts have held that an employee can be liable for aiding and abetting when the primary violation was based on that same employee's conduct. See, e.g., SEC v. City of Victorville, No. 5:13-cv-00776-JAK-DTB, Slip Op. at 66–67 (C.D. Cal. June 2, 2017); SEC v. Sells, No. C 11-4941 CW, 2012 WL 3242551, at *8 (N.D. Cal. Aug. 10, 2012).

The Court concludes that the SEC's aiding and abetting claim should not be dismissed at this early stage of litigation. Drake may show that neither he nor HCR is an "investment adviser" for the purposes of §§ 206(1)–(2). This issue is better determined on a motion for summary judgment.

Drake's motion to dismiss aiding and abetting liability is **DENIED**.

### D. Remaining Arguments

Drake makes several more arguments why the claims against him should be dismissed. First, he argues that the statute of limitations has run against him. MTD at 14–15. Namely, Drake notes that the SEC's claims are barred by the five-year statute of limitation under 28 U.S.C. § 2462. Id (citing Gabelli v. SEC, 568 U.S. 442, 454 (2013) (holding that "discovery rule" does not apply in civil actions brought by the government in Investment Adviser Act cases)). Second, he argues that the disgorgement and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | | | |
|---|---|---|---|---|
| | **CIVIL MINUTES – GENERAL** | | | **'O'** |
| Case No. | 2:17-cv-06204-CAS(GJSx) | | Date | December 18, 2017 |
| Title | SECURITIES AND EXCHANGE COMMISSION v. JEREMY JOSEPH DRAKE | | | |

injunction remedies are inappropriate and should be dismissed. Id. at 15–17. Both arguments fail.

The complaint does allege that Drake had known the Clients since 2008. Compl. ¶ 12. However, the complaint, which was filed on August 22, 2017, also alleges that Drake's illegal conduct took place between November 2012 and July 2016. Id. ¶ 5. Thus, all of Drake's conduct took place within the five-year statute of limitations imposed by 28 U.S.C. § 2462. Moreover, the government's request for an injunction is not barred by 28 U.S.C. § 2462. That statute of limitation only applies for "the enforcement of any civil fine, penalty, or forfeiture." See also SEC v. Williams, 884 F. Supp. 28, 30 (D. Mass. 1995).

As a preliminary matter, rulings on remedies are typically made after finding liability—not at the motion to dismiss stage. See SEC v. Gabelli, 653 F.3d 49, 61 (2d Cir. 2011), rev'd on other grounds by 133 S. Ct. 1216 (2013). In any matter, disgorgement and injunctive relief are proper. The SEC alleges wrongdoing serious enough to warrant an injunction against Drake to prevent him from further violating the Adviser Act. See SEC v. Haligiannis, 470 F. Supp. 2d 373, 383–84 (S.D. N.Y. 2007) (entering injunction after finding previous fraudulent conduct). Disgorgement is also proper because this remedy "is to deprive violators of their ill-gotten gains." Kokesh v. SEC, 137 S. Ct. 1635, 1643 (2017). Considering the grave nature of the allegations against Drake, disgorgement would be a proper remedy if he is found to have violated the Adviser Act.

Drake's remaining arguments in his motion to dismiss are **DENIED**.

## V. CONCLUSION

In accordance with the foregoing, the Court **DENIES** Drake's motion to dismiss the SEC's complaint. Drake shall file a response to the complaint on or before January 24, 2018.

IT IS SO ORDERED.

| | | 00 | : | 16 |
|---|---|---|---|---|
| | Initials of Preparer | | CMJ | |